A09A0568. SALAHAT v. FEDERAL DEPOSIT INSURANCE CORPORATION AS RECEIVER FOR INTEGRITY BANK.
(680 SE2d 638)

MILLER, Chief Judge.

Integrity Bank (the "Bank") filed suit against Ramsey Salahat as the guarantor of a commercial promissory note (the "Note") Ram-Mar Development, LLC ("Ram-Mar") executed in favor of the Bank in the principal amount of $11,700,000. The trial court granted, in part, the Bank's motion for partial summary judgment, concluding that the Bank was entitled to judgment as a matter of law on its claim to recover the outstanding principal amount of the debt and with respect to Salahat's counterclaim.[1] On the same day the

---

[1] Salahat's counterclaim appeared to allege that the Bank had interfered with his efforts to sell real property that had been pledged as security for Ram-Mar's indebtedness under the Note.

trial court issued its order, the Federal Deposit Insurance Corporation ("FDIC") was appointed as the receiver for the Bank, and the trial court subsequently granted the FDIC's motion to be substituted as the plaintiff in this action. Salahat appeals from the trial court's summary judgment order, arguing that the trial court erred in granting summary judgment as to his liability for the principal amount of the Note because (1) the Bank failed to give Ram-Mar notice and opportunity to cure its default and therefore improperly accelerated the Note; (2) the Bank failed to establish that it was the holder of the Note; and (3) the Bank failed to overcome Salahat's affirmative defenses. Discerning no error, we affirm.

> Summary judgment is proper when there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. OCGA § 9-11-56 (c). A de novo standard of review applies to an appeal from a grant of summary judgment, and we view the evidence, and all reasonable conclusions and inferences drawn from it, in the light most favorable to the nonmovant.

(Citation omitted.) *Matjoulis v. Integon Gen. Ins. Corp.*, 226 Ga. App. 459 (1) (486 SE2d 684) (1997).

So viewed, the record shows that Ram-Mar executed the Note in favor of the Bank on October 31, 2005, and, on the same date, Salahat, Ram-Mar's managing member, executed an Unconditional Guaranty of Payment and Performance guaranteeing Ram-Mar's debt (the "Guaranty"). Ram-Mar apparently executed the promissory note to obtain financing from the Bank related to its purchase of two parcels of real property in Dawsonville. Ram-Mar intended to develop a shopping center on the property. The Dawsonville property was pledged by Ram-Mar as security for its indebtedness to the Bank.

The Note required Ram-Mar to make interest payments on the first day of the month beginning on December 1, 2005 and continuing through October 31, 2007, when the principal amount became due and payable. In Section 7, entitled "Default and Acceleration," the Note stated that in the event of any default in the payment of principal or interest, the principal indebtedness, any other sums advanced by the Bank, and any unpaid interest that had accrued "shall, at the option of the [Bank] and without notice to [Ram-Mar], at once become due and payable and may be collected forthwith, regardless of the stipulated date of maturity." The same section,

however, went on to provide:

> Notwithstanding the foregoing . . . , [Ram-Mar] shall not be deemed to be in default of its obligations and representations contained herein . . . as to matters which require the payment of money unless and until the undersigned shall have failed to cure such default within ten (10) days after receipt by the undersigned of written notice from [the Bank] of such default.

Salahat testified during his deposition that he approached the Bank about refinancing Ram-Mar's loan in December 2006. According to Salahat, the Bank employee he spoke with told him that "she would arrange it for [him]" and referred him to loan officer David Mancuso, who handled the Dawsonville area. In early 2007, Salahat met with Mancuso to discuss refinancing and obtaining a new construction loan. Salahat testified that in subsequent conversations with Mancuso, Mancuso told him that the refinancing looked good and that he was working on underwriting the refinancing and construction loan. Salahat admitted, however, that the Bank never issued a letter of commitment for the refinancing or construction loan. At some point, Mancuso left the Bank, and Salahat was referred to a new loan officer, Rick Schuler. Salahat met with Schuler in March or April 2007 to discuss both loans and subsequently spoke with him over the phone. Schuler told Salahat that he was working on it and checking with upper management.

Subsequently, however, Ram-Mar decided to try to sell the Dawsonville property. On April 11, 2007, Ram-Mar and Real Property, LLC ("Real Property") entered into a contract under which Real Property agreed to purchase the Dawsonville property. It appears that Ram-Mar intended to pay off its indebtedness with the proceeds of the real estate sale. Thus, it requested from the Bank the "payoff" amount of the loan as of August 15, 2007, the anticipated date of the closing of the sale of the property. The sale of the Dawsonville property never closed, however, because Real Property ultimately exercised its contractual right to terminate the purchase contract during the evaluation or "due diligence" period.

Ram-Mar had ceased making interest payments under the Note in May 2007 because it ran out of interest reserves. On August 24, 2007, the Bank sent a letter to Ram-Mar and Salahat via certified mail advising them that the Note was in default and that the Bank had accelerated the debt. The Bank demanded payment of the principal, interest, and late fees.

1. Salahat argues that the Bank was not entitled to accelerate the debt Ram-Mar owed under the Note because the Bank failed to

comply with the provisions of the Note requiring it to provide Ram-Mar with written notice of default and an opportunity to cure. We disagree.

The FDIC asserts that by correspondence dated August 7, 2007, the Bank gave Ram-Mar notice of default and requested that the default be cured. But this correspondence is not included in the record on appeal, as Salahat correctly observes. During his deposition, Salahat admitted that he had received "letters" from the Bank's counsel "recording default of the loan" and that he was aware that the loan had been accelerated. The FDIC claims that, by such testimony, Salahat admitted receiving the August 7, 2007 notice of default, but given that no letter of that date was introduced into evidence or specifically referenced during the deposition, we are unable to construe Salahat's testimony as a clear admission that he received an August 7, 2007 default notice.

Apparently recognizing that the record was incomplete, the Bank's counsel suggested during the hearing on the summary judgment motion that if the trial court believed an issue of fact existed about the sufficiency of the Bank's notice of default, it should allow the Bank to supplement the record. The trial court, however, subsequently issued its order granting the Bank's motion, in part, apparently finding that no genuine issues of material fact existed regarding the notice issue. Notwithstanding the absence of the alleged August 7, 2007 correspondence from the record, we find no error in the trial court's conclusion.

It is undisputed that by letter dated August 24, 2007, counsel for the Bank wrote to Ram-Mar and Salahat notifying them that the Note was in default. The Bank further demanded payment of the entire outstanding indebtedness. If this was the first notice of default to Ram-Mar and Salahat, then Salahat is correct that the Bank's demand for immediate payment of the entire, accelerated indebtedness was premature. Instead, Ram-Mar, pursuant to Section 7 of the Note, would have had ten days from the receipt of the notice to cure its default by payment of the past due interest and any associated penalties. Even if the August 24, 2007 notice made a premature demand for payment of the entire indebtedness, however, we conclude that it nonetheless constituted sufficient written notice of default under Section 7.

In interpreting a promissory note, we first decide whether the language is clear and unambiguous. *Hammer Corp. v. Wade*, 278 Ga. App. 214, 217 (1) (628 SE2d 638) (2006). If the language is unambiguous, we enforce the agreement according to its terms. Id. Section 7 does not state that the written notice of default provided by the Bank must include a demand for past due amounts or spell out

YALE LAW LIBRARY

Ram-Mar's right to cure within ten days. The August 24, 2007 correspondence advised Ram-Mar and Salahat that the Note was in default, and that was all Section 7, by its plain terms, required. There is no evidence in the record that subsequent to the August 24, 2007 notice, Ram-Mar cured or attempted to cure its default. As such, after the expiration of ten days, the Bank was entitled to accelerate the Note without any further notice to Ram-Mar. Accordingly, Salahat's contention that the Bank improperly accelerated Ram-Mar's indebtedness under the Note is without merit.

2. Salahat claims that the trial court erred in granting summary judgment in the Bank's favor as to his liability for the principal because material issues of fact exist as to whether the Bank is the holder of the Note. We disagree.

Pursuant to OCGA § 11-3-301, "the holder of the instrument" is among the persons entitled to enforce a promissory note. OCGA § 11-3-301 (i). A "holder" of an instrument "means the person in possession if the instrument is payable to bearer or, in the case of an instrument payable to an identified person, if the identified person is in possession." OCGA § 11-1-201 (20). In support of its motion for partial summary judgment, the Bank submitted the affidavit of Mark B. Melnikoff, the Bank's Vice-President, who stated: "I am familiar with the business records of Integrity Bank with regard to its business loans and more particularly with the records involved in the transaction which is the subject matter of this lawsuit. These records are kept under my supervision and control." Melnikoff testified that the copies of the Note and Guaranty that were attached to his affidavit were true and correct copies of the same. Melnikoff's affidavit thus established that the Note was among the Bank's business records and in the Bank's possession. As such, the Bank submitted competent proof that it is the holder of the Note.

Salahat, on the other hand, offered no proof that the Bank is not the holder of the Note. While Salahat testified in his deposition that he had heard from various third parties that the Bank planned to sell the Note to an unidentified New York investor, this hearsay testimony lacks probative value. *Harrell v. Fed. Nat. Payables*, 264 Ga. App. 501, 504 (3) (591 SE2d 374) (2003).

3. Finally, Salahat contends that genuine issues of material fact exist regarding its affirmative defenses of waiver and estoppel. This claim lacks merit.

*Waiver*. Salahat argues that the Bank waived its right to enforce the terms of the Note by repeatedly assuring and promising him that Ram-Mar's loan would be reworked. According to Salahat, before relying on the terms of the Note, the Bank was required to give him

a notice of strict compliance pursuant to OCGA § 13-4-4, which states:

> Where parties, in the course of the execution of a contract, depart from its terms and pay or receive money under such departure, before either can recover for failure to pursue the letter of the agreement, reasonable notice must be given to the other of intention to rely on the exact terms of the agreement.

Salahat's argument finds no support in the record.

There could have been no mutual departure from the terms of the Note prior to May 2007, given that Ram-Mar was making the required interest payments under the Note until that time. In May 2007, Ram-Mar ceased making interest payments. No mutual departure within the meaning of OCGA § 13-4-4 could have occurred thereafter either because there is no evidence that Ram-Mar made any subsequent payments to the Bank. *Gibson v. Gainesville Bank & Trust*, 226 Ga. App. 679, 681 (487 SE2d 460) (1997) ("While a quasi-new agreement may arise where the parties mutually depart from the terms of an executory contract, to support such a departure there must be some evidence that money was paid or received under such departure.") (citations omitted). In addition, "[f]or a departure from the terms of a contract to be sufficient to require notice by one of the parties of his or her intention to insist upon strict compliance with the contract, the departure must be mutual and intended. . . ." (Citations omitted.) *Duncan v. Lagunas*, 253 Ga. 61, 62 (1) (316 SE2d 747) (1984). The record here is devoid of any evidence that the Bank agreed to tolerate Ram-Mar's nonpayment or intended to forego its enforcement rights under the Note. See *Quintanilla v. Rathur*, 227 Ga. App. 788, 792 (2) (490 SE2d 471) (1997) (no evidence supported defendant's contention that plaintiff agreed to nonpayment).

*Estoppel.* Salahat also claims that the Bank is estopped from enforcing the Note by its alleged assurances that Ram-Mar's loan would be refinanced. On the present record, Salahat's estoppel defense fails because, among other reasons, Salahat cannot establish detrimental reliance on the Bank's alleged assurances. See *Bell v. Studdard*, 220 Ga. 756, 760 (4) (141 SE2d 536) (1965) (reliance and prejudicial change of position are necessary elements of equitable estoppel). The record refutes Salahat's claim that the Bank's assurances somehow induced Ram-Mar to default on the loan. Salahat testified that the default resulted because Ram-Mar simply ran out of interest reserves.

For the reasons set forth above, we affirm the trial court's order granting in part the Bank's motion for partial summary judgment.

630

*Judgment affirmed. Andrews, P. J., and Barnes, J., concur.*

DECIDED JUNE 30, 2009.

*Fine & Block, John B. Levy,* for appellant.
*Taylor, English & Duma, John J. Richard, Jason R. Curles,* for appellee.